Steven N. Williams (Pro Hac Vice)
E-mail: swilliams@munsch.com
William Zac Duffy (Pro Hac Vice)
E-mail: zduffy@munsch.com
**MUNSCH HARDT KOPF & HARR, P.C.**
500 N. Akard Street, Suite 3800
Dallas, TX 75201-6659
Telephone: 214.855.7544

Attorneys for Plaintiff Leo India Films Ltd.
d/b/a Einthusan.TV

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Leo India Films Ltd. d/b/a Einthusan.TV,<br><br>                    Plaintiff,<br><br>v.<br><br>GoDaddy.Com, LLC,<br><br>                    Defendant. | Case No. 2:19-cv-4803<br><br>**FIRST AMENDED COMPLAINT AND<br>DEMAND FOR JURY TRIAL** |

Plaintiff Leo India Films Ltd. d/b/a Einthusan.tv ("Einthusan") brings the following complaint against Defendant GoDaddy.com, LLC ("GoDaddy") seeking a preliminary and permanent injunction, declaratory relief and damages, and alleging as follows:

## THE PARTIES

1.      Einthusan is a company organized and existing under the laws of Canada, with a principal place of business at 1050 Markham Road, Suite 411, Scarborough, Ontario, M1H2Y7. Einthusan is a citizen of Canada.

4894-4135-7100v.1

2. GoDaddy is a Delaware limited liability company with a principal place of business at 14455 N. Hayden Rd., Ste. 226, Scottsdale, AZ 85260. GoDaddy may be served through its statutory agent for service of process, Corporation Service Company, 8825 N 23rd Avenue, Suite 100, Phoenix, AZ 85021, or wherever it may be found. Upon information and belief, GoDaddy's owners and/or members are not citizens of Canada. They are citizens of either Arizona and/or Delaware.

## JURISDICTION AND VENUE

3. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), as the amount in controversy exceeds $75,000 and the dispute is between a citizen of a state and citizen of a foreign state.

4. This Court has personal jurisdiction over GoDaddy in that its principal place of business is in this District, and, on information and belief, GoDaddy is authorized to do business in the State of Arizona and has purposefully availed itself of the benefits and protection of Arizona law.

5. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because all or a substantial part of the events or omissions giving rise to the claim occurred within this District. GoDaddy has purposefully availed itself of the benefits and protection of Arizona law by operating in Arizona and entering into agreements that expressly provide Arizona law will govern any disputes among the parties.

## FACTUAL SUMMARY

6. Einthusan operates an Internet website at www.einthusan.tv (the "Domain") from which it distributes licensed video content by artists from India and other South Asian countries.[1] Einthusan registered the Domain with GoDaddy on or about February 19, 2013. Einthusan earns revenue through subscriptions fees that customers pay in order to access and view the content contained on the einthusan.tv web site, and also, more significantly, through selling advertising space on its website. Typically, Einthusan's customer viewership is at its

---

[1] Some of the video content offered on the Einthusan website is in the public domain and does not require any license.

peak during the holiday season in November and December of each year. Consequently, Einthusan earns the largest portion of its income from advertising revenue during this time period as well.

7. Einthusan and GoDaddy entered into two agreements when Einthusan registered the Domain on February 19, 2013. One agreement was the GoDaddy Universal Terms of Service Agreement, dated January 10, 2013 ("TOS Agreement"), attached hereto as Exhibit 1. Another agreement was the GoDaddy Domain Name Registration Agreement, dated September 7, 2012 ("Registration Agreement"), attached hereto as Exhibit 2 (collectively, the TOS Agreement and Registration Agreement hereafter referred to as the "Agreements"). Both Agreements were contracts of adhesion; prepared by GoDaddy and offered to Einthusan on essentially a "take it or leave it" basis, without affording Einthusan a realistic choice as to either Agreement's terms.

8. As explained by the Ninth Circuit, there are three primary actors in the domain name system.[2] Companies called "registries" operate a database (or "registry") for all domain names within the scope of their authority. Companies like GoDaddy called "registrars" act as a middleman to register domain names with the registries on behalf of those who own the names. Registrars maintain an ownership record for each domain name they have registered with a registry. Individuals and companies called "registrants" own the domain names. Registrants interact with the registrars, who in turn interact with the registries.

9. On or about July 9, 2019, GoDaddy suddenly suspended Einthusan's account without any warning or advanced notification, resulting in the "einthusan.tv" website becoming inaccessible to all website traffic, and effectively cutting off all revenue that Einthusan would otherwise earn from the website. GoDaddy has not cited any provision of either the TOS Agreement or the Registration Agreement to justify its decision to suspend

---

[2] *See Office Depot, Inc. v. Zuccarini*, 596 F.3d 696, 699 (9th Cir. 2010) (explaining the roles of both registrars and registries).

3

Einthusan's account and disable its website. Einthusan attempted to transfer its Domain to another registrar, but GoDaddy unjustifiably blocked Einthusan's efforts.[3]

10. In order to maintain the integrity of the Registry database, registrars must coordinate with each other when a domain registration is transferred from one registrar (the "Losing Registrar") to another registrar (the "Gaining Registrar"). GoDaddy's website[4] describes the steps a registrant should take to transfer a domain to another registrar:

"Transfer my domain away from GoDaddy

"If you don't want your domain name registered with GoDaddy, you can transfer it away to another registrar. You'll start the process with GoDaddy, and complete it with your new registrar. If you are transferring a .UK domain name, you'll need to request an update to the IPS tag.

"1. You'll need access to the administrative email address listed on your domain name (or the Registrant email address for a .AU domain name). Verify the current contact information and update as needed.

"2. Remove Protected Registration and Private Registration from your domain if you haven't already.

"3. Unlock your domain name.

"4. Get an authorization code (sometimes referred to as an EPP code or transfer key).

"5. Initiate the transfer through your new registrar. Each registrar has their own process, so you'll want to confirm their requirements for this step.

"Note: Domains are not eligible for transfer to another registrar if they are within 60 days of registration or a previous transfer, or if a customer opted-in to apply a 60-day transfer lock after a Change of Registrant."

---

[3] In or around February 2020, GoDaddy unlocked the Domain, at which time Einthusan was able to transfer it to another registrar.
[4] https://www.godaddy.com/help/transfer-my-domain-away-from-godaddy-3560.

4894-4135-7100v.1

|   |   |
|---|---|
| 1 | "6. GoDaddy will send your admin email address an accept or deny email. |
| 2 | If you wait 5 days, GoDaddy automatically accepts the transfer. You'll |
| 3 | receive another email from GoDaddy when the process is done." |

11. On July 10, 2019, Einthusan submitted a request to a Gaining Registrar to transfer the Domain from GoDaddy. The transfer could not be completed, however, because GoDaddy had locked the Domain to prevent its transfer.

12. On July 11, 2019, Einthusan contacted GoDaddy by telephone to request a transfer of the Domain to the Gaining Registrar. Einthusan's legal counsel followed up with a written request to transfer on July 12, 2019. A third request to transfer the Domain was made on July 16, 2019. Despite each of these requests, GoDaddy refused to unlock the Domain so that Einthusan can transfer it to another registrar.

13. GoDaddy did not cited any provision under either the TOS Agreement nor the Registration Agreement purporting to authorize it to maintain a lock on the Domain in order to prevent Einthusan from transferring it.

### GoDaddy's Terms of Service Agreements

14. According to the terms of the Registration Agreement, "electronic acceptance of this Agreement signifies that you have read, understand, acknowledge and agree to be bound by this Agreement, along with (i) Go Daddy's Universal Terms of Service Agreement (*i.e.*, the TOS Agreement), and (ii) any plan limits, product disclaimers or other restrictions presented to you on the Domain Name Registration Services landing page of the Go Daddy website (this "Site"), both (i) and (ii) of which are incorporated herein by reference."

15. It further provides that "Go Daddy, in its sole and absolute discretion, may change or modify this Agreement, and any policies or agreements which are incorporated herein, at any time, and such changes or modifications shall be effective immediately upon posting to this Site, and (ii) your use of this Site or the Services found at this Site after such changes or modifications have been made (as indicated by the "Last Revised" date at the top of this page) shall constitute your acceptance of this Agreement as last revised. **If you do**

4894-4135-7100v.1

**not agree to be bound by this Agreement as last revised, do not use (or continue to use) this Site or the Services found at this Site.**" (Emphasis in original.)

16. As indicated by the portion of the Registration Agreement shown above in bold, GoDaddy's Registration Agreement purports to give its customers the right to stop using its Site and Services. Einthusan attempted to exercise that right by transferring the Domain to another registrar when GoDaddy suspended the Domain.

17. The Registration Agreement also contains a provision under which GoDaddy purportedly exercises broad discretion to take any action it deems necessary in response to a complaint:

> "Go Daddy is notified that a complaint has been filed with a governmental, administrative or judicial body, regarding a domain name registered by you using Go Daddy, that Go Daddy, in its sole discretion, may take whatever action Go Daddy deems necessary regarding further modification, assignment of and/or control of the domain name deemed necessary to comply with the actions or requirements of the governmental, administrative or judicial body until such time as the dispute is settled."

18. As noted above, the Registration Agreement incorporated the TOS Agreement, which also contains several provisions that purport to give GoDaddy unilateral discretion over the domains it has registered for its customers. For example, it includes a broad reservation of rights provision under which GoDaddy "expressly reserves the right to deny, cancel, terminate, suspend, lock, or modify access to (or control of) any Account or Services (including the right to cancel or transfer any domain name registration) for any reason (as determined by Go Daddy in its sole and absolute discretion)…"

19. What's more, GoDaddy's Registration Agreement and TOS Agreement is littered with provisions purporting to give GoDaddy the unilateral right to modify the terms without notice to Einthusan, including the services provided, prices of such services, and its dispute resolution program. *See e.g.* Ex. 1, § 15(A) ("Go Daddy expressly reserves the right to change or modify its prices and fees at any time, and such changes or modifications shall

4894-4135-7100v.1

be posted online at this Site and effective immediately without need for further notice to you."); Ex. 2, § 5 ("You agree that Go Daddy may from time to time modify its Dispute Resolution Policy…You agree to review Go Daddy's website periodically to determine if changes have been made to the Dispute Resolution Policy"); Ex. 2, § 12 ("You agree that we, in our sole discretion, may modify our dispute policy… You agree that, by maintaining the reservation or registration of your domain name after modifications to the dispute policy become effective, you have agreed to these modifications.") These provisions purporting to give GoDaddy the right to make material alterations to the terms of the agreements are not made conspicuous in the Registration or TOS Agreements. *See Id*.

20. The TOS Agreement also claims to limit GoDaddy's liability to the total amount paid by Einthusan for GoDaddy's services "whether based on warranty, contract, tort, or any other legal or equitable theory…". Ex. 1, § 13. Conversely, the TOS Agreement requires Einthusan to indemnify GoDaddy from and against all claims. Ex. 1, § 14. The TOS Agreement limits GoDaddy's liability at a fraction of Einthusan's damages from GoDaddy's lockout, and simultaneously imposes an uncapped obligation on Einthusan to indemnify and hold GoDaddy harmless from any and all claims.

21. Through these provisions, GoDaddy purports to exercise unlimited, unfettered discretion over the Domain. As set forth below, GoDaddy abused this discretion when it refused to allow the domain to be transferred to another registrar.

22. The above-described conduct of GoDaddy in locking the Domain and interfering with Einthusan's attempt to transfer the Domain to another registrar caused immediate, severe, and irreparable harm.

**FIRST COUNT**

**(Breach of Contract)**

23. Einthusan repeats, realleges and incorporates herein by reference the allegations contained in paragraphs 1 through 22 as set forth above.

24. GoDaddy breached the Registration Agreement by suspending Einthusan's account and locking the domain, thereby preventing the transfer of the domain to another

7

registrar. Paragraph 7 of the Registration Agreement provides that the services may be suspended only under certain conditions, none of which were applicable here. Specifically, the Registration Agreement provides that an account is subject to being suspended if (1) there is an unresolved breach of the Registration Agreement and/or (2) suspension or cancellation is required by any ICANN policy. Neither of these conditions were present. As such, GoDaddy was unjustified in suspending Einthusan's account and unilaterally refusing to allow Einthusan to transfer its domain to another registrar. Einthusan's website was locked from July 9, 2019 through February 2020, and GoDaddy prevented it from being transferred to another company during that period. GoDaddy's actions caused severe economic harm to Einthusan. Einthusan lost revenue both in the form of subscription fees and, more importantly, advertising revenue during the period in which GoDaddy had locked the Domain. In addition, Einthusan's goodwill and business reputation, both with subscribers and advertisers, was severally injured and diminished while GoDaddy locked the Domain.

## SECOND COUNT

### (Breach of Implied Covenant of Good Faith and Fair Dealing Sounding In Tort, Or Alternatively, In Contract)

25. Einthusan repeats, realleges and incorporates herein by reference the allegations contained in paragraphs 1 through 22 as set forth above.

26. The law implies a covenant of good faith and fair dealing in every contract. When a contract confers discretion on one party, the implied covenant requires that such discretion be used reasonably and in good faith. Whether a party breached the covenant is a question of fact for the jury.

27. In Arizona, a party may bring a tort action for breach of an implied covenant if there is a "special relationship arising from elements of public interest, adhesion, and fiduciary responsibility." *Burkons v. Ticor Title Ins. Co.*, 168 Ariz. 345, 355, 813 P.2d 710, 720 (1991). Among the special relationships in which such tort damages for breach of contract may be available are those undertaken for something more than or other than commercial advantage, such as the procurement of service, professional help, security, or

8

1  other intangibles. *Id*. Also, the assessment of tort damages for breach of contract is a device
2  most often allowed in situations in which the rule restricting recovery to contract damages
3  would promote breach of contract rather than its performance. *Id.*

4  28.  On February 19, 2013, Einthusan entered into the Agreements in order to procure GoDaddy's services as Einthusan's registrar–to act as Einthusan's middleman to register Einthusan's domain name with the registries on Einthusan's behalf. The Agreements were contracts of adhesion; prepared by GoDaddy and offered to Einthusan on essentially a "take it or leave it" basis, without affording Einthusan a realistic choice as to either Agreement's terms. As a result, a special relationship was created and existed between Einthusan and GoDaddy.  The Agreements purport to limit GoDaddy's liability to Einthusan to the total amount paid by Einthusan for GoDaddy's services "whether based on warranty, contract, tort, or any other legal or equitable theory…". Ex. 1, § 13. According to these provisions, GoDaddy's liability for breaching the Agreements by suspending the Account would be a small fraction of the damages suffered by Einthusan resulting from GoDaddy's lockout.

29.  GoDaddy breached the covenant of good faith and fair dealing by exercising its discretion unreasonably and in bad faith, for a reason beyond the risks assumed by Einthusan and/or for a reason inconsistent with Einthusan's justified expectations. GoDaddy breached the implied covenant by locking the Domain, and blocking Einthusan from transferring the Domain to a competing registrar without proper justification. GoDaddy appears to have been at least partially motivated by self-interest in preventing a competing registrar from gaining the Domain. GoDaddy's decisions to lock the Domain for a period of time and prevent its transfer were inconsistent with Einthusan's reasonable expectations when it contracted with GoDaddy to register the Domain, and evidence GoDaddy's conscious pursuit of a course of conduct knowing that it created a substantial risk of harm to Einthusan. GoDaddy's breach of the implied covenant caused Einthusan's website to be completely inoperable, particularly through the busiest part of Einthusan's business year (from November through New Year's), resulting in significant injury to Einthusan in the form of,

among other things, loss of goodwill and business reputation among both its customers and its advertisers, and also the loss of thousands of dollars of revenue caused by the lengthy downtime of its website. Einthusan lost revenue both in the form of subscription fees and, more importantly, advertising revenue during the period in which GoDaddy had locked the Domain.  In addition, Einthusan's goodwill and business reputation, both with subscribers and advertisers, was severally injured and diminished while GoDaddy locked the Domain. Einthusan's damages far exceed GoDaddy's unconscionably low limitation of liability—which, Einthusan believes, was a motivating factor in GoDaddy's decision to unjustifiably suspend the Account. Given that a "special relationship" existed between Einthusan and GoDaddy based on the factors of adhesion and the services contracted for, Arizona law allows for the recovery of tort damages on Einthusan's breach of the implied covenant of good faith and fair dealing claim. Alternatively, Einthusan is entitled to recovery on its claim under the principles of contract law.

## THIRD COUNT

### (Tortious Interference with Contract and Business Relations)

30.  Einthusan repeats, realleges and incorporates herein by reference the allegations contained in paragraphs 1 through 2_ as set forth above.

31.  Einthusan had existing and prospective business relationships with advertisers and users of the einthusan.tv website. GoDaddy was aware of the existence of those relationships. GoDaddy disabled the Domain and locked it in the absence of justification. It continued to maintain the lock after Einthusan asked for the Domain to be transferred to another registrar. These actions by GoDaddy constituted an intentional and improper interference that has caused a disruption with those business relationships.  GoDaddy's actions caused Einthusan to suffer significant injury in the form of, among other things, loss of goodwill and business reputation among both its customers and its advertisers, and also the loss of thousands of dollars of revenue caused by the lengthy downtime of its website. Einthusan lost revenue both in the form of subscription fees and, more importantly, advertising revenue during the period in which GoDaddy had locked the Domain.  In

10

1  addition, Einthusan's goodwill and business reputation, both with subscribers and
2  advertisers, was severally injured and diminished while GoDaddy locked the Domain.

### FOURTH COUNT

### (Declaratory Judgment of Unconscionability)

5  32.    Einthusan repeats, realleges and incorporates herein by reference the allegations contained in paragraphs 1 through 2_ as set forth above.

33.    The commercial transaction contemplated by the parties was relatively simple. GoDaddy agreed to register the Domain with the appropriate Registry (*i.e.*, a registry by the name of "Verisign") in exchange for a fee. However, GoDaddy subjects its customers to a multitude of other terms and conditions that purport to leave them with no rights or legal recourse against its unfair or arbitrary decisions. The Agreements purport to allow GoDaddy unilaterally to: (i) lock, disable, and preclude Einthusan from transferring its Domain to GoDaddy's competitors with or without justification; (ii) modify material terms of the Agreements without notice to Einthusan; (iii) enforce new or modified terms imposed by GoDaddy as if bargained for in the original agreement; and (iv) limit its own liability in an unconscionable manner while, at the same time, impose unlimited liability on its customers like Einthusan through its indemnity provision. GoDaddy alone drafted the Agreements. GoDaddy did not explain the terms thereof to Einthusan prior to execution. GoDaddy did not provide the majority of the above-referenced provisions in conspicuous type-face. The circumstances in which the Agreements were entered into, and the harsh, one-sided and oppressive provisions therein evidence that the Agreements were so one-sided as to oppress or unfairly surprise Einthusan, and reflect an overall imbalance in the obligations and rights imposed by the Agreements. Furthermore, GoDaddy's unilateral modification of the Agreements' terms and conditions further indicates that a real, voluntary meeting of the minds never occurred.

34.    Given the ever-increasing amount of commerce now done on internet websites, the exceedingly broad discretion allegedly exercised by GoDaddy over its customers gives it

4894-4135-7100v.1

the power to put a company out of business. This is particularly true for an online media streaming platform like Einthusan that relies completely on its website for its business.

35.  Einthusan paid all amounts due to GoDaddy, yet GoDaddy unilaterally disabled its website and prevented Einthusan from transferring its Domain to another registrar. Again, Einthusan only contracted with GoDaddy to perform the simple administrative task of registering its domain name. Einthusan could have picked a number of registrars to perform this task when it selected GoDaddy.  Einthusan was unaware that GoDaddy would be able arbitrarily and unilaterally to lock its Domain and prevent it from transferring the Domain to another registrar.

36.  Einthusan requests a declaratory judgment that the terms of the GoDaddy Registration Agreement and TOS Agreement purporting to give GoDaddy broad discretion over the Domain are procedurally and substantially unconscionable. GoDaddy should not have had the power to disable Einthusan's website unilaterally, without any notice or due process, while simultaneously blocking Einthusan from transferring its business to one of GoDaddy's competitors.

37.  Einthusan also reserves the right to assert that any other contractual provision relied upon by GoDaddy in this litigation is unconscionable. For example, the TOS Agreement in effect on February 19, 2013 (when Einthusan entered into an agreement with GoDaddy to register the Domain) did not contain an arbitration provision. The version of the TOS Agreement listed on GoDaddy's website at the time it locked the Domain did, however, contain a provision requiring all disputes with GoDaddy to be arbitrated. Einthusan never agreed to that provision. To the extent GoDaddy would attempt to impose its arbitration provision upon Einthusan in this litigation, the Court should declare that provision of the modified TOS Agreement to be unconscionable. *See, e.g., Edwards v. Vemma Nutrition*, 2018 U.S. Dist. LEXIS 15371, at *13 (D. Ariz. Jan. 30, 2018) ("The Court concludes that the unilateral modification provision is, in the context of the arbitration agreement, substantively unconscionable. It purports to grant Vemma an unfettered right to change the terms of

arbitration altogether, including requiring Plaintiff to arbitrate a dispute he did not originally agree to arbitrate.").

## DEMAND FOR JURY TRIAL

38. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Einthusan hereby demands a trial by jury on issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Einthusan respectfully requests that this Court enter judgment in its favor and against Defendant GoDaddy as follows:

1. For compensatory damages, including but not limited to, lost profits;
2. For punitive damages;
3. For interest at the legal rate, including prejudgment interest, from the time allowed by law;
4. For costs of suit incurred herein;
5. For attorney's fees incurred herein to the fullest extent allowed by law;
6. For a declaratory judgment that the Registration Agreement and the TOS are unconscionable in at least the provisions that purportedly allowed GoDaddy to (i) lock, disable, and preclude Einthusan from transferring its Domain to GoDaddy's competitors with or without justification; (ii) modify material terms of the Agreements without notice to Einthusan;  (iii) enforce new or modified terms imposed by GoDaddy as if bargained for in the original agreement; and (iv) limit its own liability in an unconscionable manner while, at the same time, impose unlimited liability on its customers like Einthusan through its indemnity provision;
7. For such other and further relief as the Court may deem proper.

DATED this 29th day of July, 2022

4894-4135-7100v.1

By: /s/ *Steven N. Williams*

**MUNSCH HARDT KOPF & HARR,**
Steven N. Williams (Pro Hac Vice)
E-mail: swilliams@munsch.com
William Zac Duffy (Pro Hac Vice)
E-mail: zduffy@munsch.com
500 N. Akard Street, Suite 3800
Dallas, TX 75201-6659

Attorneys for Plaintiff
Leo India Films Ltd. d/b/a/ Einthusan.TV

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will serve a copy on all counsel of record.

/s/ *Steven N. Williams*
Steven N. Williams

## **INDEX OF EXHIBITS**

| Exhibit 1 | GoDaddy Universal Terms of Service Agreement, dated January 10, 2013 |
|---|---|
| Exhibit 2 | GoDaddy Domain Name Registration Agreement, dated September 7, 2012 |

14

4894-4135-7100v.1